Filed 4/2/24  P. v. Hasley CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GERRELL HASLEY, JR.,<br><br>Defendant and Appellant. | F084914<br><br>(Super. Ct. No. BF173252A)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[No Change in Judgment] |

**THE COURT:**

It is ordered that the opinion filed herein on March 13, 2024, be modified as follows:

1.  On page 3, the last sentence of the first full paragraph, beginning "The total aggregate sentence" is modified to read as follows:

> The total aggregate sentence imposed was an indeterminate term of 25 years to life plus life with the possibility of parole after seven years and a determinate term of two years eight months.

2.  In the paragraph commencing at the bottom of page 9 below the subheading *Forensic Evidence* and ending at the top of page 10, the fourth sentence, beginning "Specifically" is modified to read as follows:

> Specifically, as to the exterior front passenger-side door handle, "for the African-American population …, it would be 31 sextillion times more

likely that it's [defendant] than a coincidental match to an unrelated person."

3.  On page 26, in the first full paragraph, delete the sentence following the citation to *People v. Valerio* (1970) 13 Cal.App.3d 912, 924 and add the following sentences:

> Here, while defendant and Thomason had separate juries, it was still incumbent on defendant's counsel to argue in favor of instructing his jury with CALCRIM No. 335 instead of CALCRIM No. 334, specifically as to Thomason.  Counsel may have had a tactical reason for not making this request in this atypical situation.  In any event, as we subsequently discuss, any error in failing to instruct the jury pursuant to CALCRIM No. 335 was harmless.

There is no change in the judgment.  Except for the modifications set forth, the opinion previously filed remains unchanged.

Appellant's petition for rehearing is denied.

PEÑA, J.

WE CONCUR:

DETJEN, Acting P. J.

SMITH, J.

2.

Filed 3/13/24  P. v. Hasley CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GERRELL HASLEY, JR.,<br><br>Defendant and Appellant. | F084914<br><br>(Super. Ct. No. BF173252A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Charles M. Bonneau, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

On July 15, 2022, a jury convicted defendant Gerrell Hasley, Jr., of, among other offenses, the first degree murder (Pen. Code, §§ 187, subd. (a), 189; count 1) and

aggravated kidnapping (§ 209, subd. (b); count 3) of Moises Leon.[1]  (Undesignated statutory references are to the Penal Code.)  Subsequently, as to count 1, defendant was sentenced to an indeterminate term of 25 years to life, and as to count 3, he was sentenced to a consecutive indeterminate term of life with the possibility of parole after seven years.

On appeal, defendant contends:  (1) the trial court prejudicially erred when it denied his severance motion and allowed introduction of evidence that he "was in possession of another firearm, not the murder weapon, four days after the homicide" (capitalization omitted); (2) that "[a]side from the accomplice statements and testimonies, there is a lack of evidence connecting [him] with the murder itself or with the predicate felonies of robbery, kidnapping, and torture"; (3) the trial court prejudicially erred when it "improperly failed to instruct that the suspect witnesses were accomplices as a matter of law" *and* when it "instructed that [he] had the burden of proof to show that the prosecution witnesses, prime suspects in the robbery murder, were accomplices"; and (4) "it was an abuse of discretion for the trial court to impose a consecutive term on Count Three" because "[t]here was a single intent and objective to the kidnapping for robbery and the murder."

We conclude, that as to each individual claim, the trial court did not err, nor was there insufficient evidence apart from the accomplices' statements and testimonies. Accordingly, we affirm the judgment.

## PROCEDURAL HISTORY

On October 10, 2018, the Kern County District Attorney filed an information charging defendant with first degree murder (§ 187, subd. (a); count 1) with the allegation

---

[1]Moises Leon also went by the name of Raul Soriano and is referred to as "Raul" throughout the record.  However, all documents throughout the clerk's transcript refer to the victim as "Moises Leon."  Therefore, we will refer to the victim as "Leon" throughout the entirety of this opinion.

2.

the murder was done by one of the following means: (1) destructive device or explosive; (2) weapon of mass destruction; (3) armor penetrating ammunition; (4) poison; (5) lying in wait; (6) torture; (7) willful, deliberate, and premeditated killing; (8) discharge of a firearm from a motor vehicle, intentionally at another person outside the vehicle, with the intent to inflict death; or (9) perpetration of, or attempt to perpetrate; arson, rape, carjacking, robbery, burglary, mayhem, or kidnapping; torture (§ 189, subd. (a)); torture (§ 206; count 2); aggravated kidnapping (§ 209, subd. (b); count 3); robbery (§ 212.5, subd. (c); count 4); arson (§ 451, subd. (d); count 5); and unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1); count 6).

On July 15, 2022, a jury found defendant guilty on all counts. Subsequently, as to count 1, the trial court sentenced defendant to an indeterminate term of 25 years to life. As to count 3, the trial court sentenced defendant to an indeterminate term of life with the possibility of parole after seven years, to run consecutive to count 1. As to count 5, the trial court sentenced defendant to the middle term of two years, to be served consecutive to count 3. As to count 6, the trial court sentenced defendant to the term of eight months, which is one-third the middle term of three years, to be served consecutive to count 5. As to count 2, the trial court sentenced defendant to an indeterminate term of life with the possibility of parole after seven years, but stayed the sentence pursuant to section 654. As to count 4, the trial court sentenced defendant to the middle term of three years, but stayed the sentence pursuant to section 654.[2] The total aggregate sentence imposed were two indeterminate terms of 25 years to life plus life with the possibility of parole after seven years *and* a determinate term of two years eight months.

---

[2]Both the minute order and abstract of judgment incorrectly state defendant was sentenced to the *lower* term of three years. Second degree robbery, of which defendant was found guilty, is punishable by "two, three, or five years" in prison (§ 213, subd. (a)(2)).

FACTS

*The Prosecution Case-in-Chief*

### Background

In July 2018, defendant, Seantazz Thomason, Derrick Sutton, and Jamie Reed all lived at the Q Street apartment complex in Bakersfield. Alyssa G., a minor, lived with Reed. (Derrick Sutton, Jamie Reed, and Alyssa G. testified pursuant to a testimonial immunity agreement.) Reed also associated with Leon, and they worked together to steal merchandise and resell it at Leon's store. Reed referred to this practice as "boosting." Leon would give Reed half the cash received from reselling the stolen merchandise.

### The Plot to Rob Moises Leon

During the summer of 2018, Reed often observed Leon with large amounts of cash on his person. Leon "would always be showing it. He would always say that he had enough to buy a car with it if he wanted to buy one, if he saw one. [Reed] always told him he needed to keep it in his pocket." On July 26, 2018, Reed called Sutton and suggested "we rob [Leon]." Reed and Sutton decided Reed was "going to call [Leon] back to [her] apartment [¶] … [¶] [and] when he left, that's—that's when it would happen." Alyssa G. overheard this conversation and heard Reed explain to Sutton how she wanted the robbery to "go down." Reed was the "mastermind" behind the robbery.

Later on, Thomason approached Sutton and told him "he wanted to get in on the robbery." Sutton told Thomason he "was going to use a BB gun" and he was "just trying to make it smooth, just get the money and let [Leon] go." However, Thomason disagreed and told Sutton "he wanted to use real guns," but Sutton said he "didn't want to do that." Sutton and Reed had observed Thomason in the past with a firearm.

### The Murder of Moises Leon

Later that same night, Reed called Leon and told him "[t]o come back over and to hang out with [her] and Alyssa." (According to Reed, Leon "had a thing for Alyssa.")

Leon came over to the apartment and they "discussed [Leon] … buying some beer and coming back to hang out some more." Leon then left the apartment and Alyssa G. observed Reed text Sutton it was "go time." Subsequently, Reed and Alyssa G. heard "commotion" outside the apartment door. Reed described hearing "[f]ighting, people fighting." Specifically, she testified she heard "[p]eople, they were like arguing, and somebody getting hit. When it was close to [her] door, [she] overheard voices talking about taking him to his bank to get money from the bank. Then it faded." Alyssa G. testified, "It was just like a lot of movement, like something was hitting the floor or [she] heard commotion. That was just it, like banging but like falling to the floor, then [she] heard [Leon] at one point." During this commotion, Leon was heard saying, "'[Reed], help.'" Reed also heard defendant and Thomason say, "'Let's take him to the bank.'"

Reed then told Alyssa G. "to go take a shower, and [Reed] started vacuuming." Reed looked out the window and saw Leon's truck, later identified as a red 2011 Chevrolet Silverado (Silverado), pull out of the parking lot and exit the apartment complex; defendant and Thomason were in the Silverado with the victim. Fifteen minutes later, Sutton approached Reed and told her "it had gone too far and he didn't want to be involved anymore," and "that the two gentlemen [defendant and Thomason] had left in the [Silverado] with [Leon]."

Later on, Thomason returned to the apartment and told Reed "he jumped out of the car when [Leon] got shot." At another point during the evening, Reed found Leon's white shirt with blood on it outside her front door; she burned the shirt in a pot behind the apartment. Reed then returned to the apartment and gave Alyssa G. "a bottle of peroxide mixed with bleach" and told her "to go scrub the dried blood off the stairs." Alyssa G. saw "[m]aybe like four or five" drops of blood on the stairs.

The next day, Reed observed Thomason holding a pillowcase with something wrapped inside. Thomason told her there was a firearm inside the pillowcase, but she never personally observed the firearm.

5.

During a police interview, Reed told law enforcement she also observed a firearm "she referred to as the … automatic in a backpack that was brightly colored." Further, she told officers "the gun that she saw [Thomason] with that night was a scary gun, which was bigger than [one of the interviewing officer]'s gun." Reed also told officers she had observed Thomason "with a sawed-off shotgun before." Additionally, after Reed's initial contact with law enforcement a few days after the incident, she visited defendant at a hotel "[t]o warn him that he needed to—that he needed to go, that he needed to try to get away."

### *The Subsequent Fire and Murder Investigation*

On July 27, 2018, at approximately 3:30 a.m., the fire department responded to a vehicle fire on Pacheco Road in Bakersfield. Law enforcement and fire personnel located a Silverado parked in a parking stall in an alley with both its rear passenger side door and hood open. Fire personnel observed "smoke coming out the windows, [and] fire inside the cab." The fire was located "on the dash[board] of the front passenger side." Fire personnel "brought the hose line to the passenger side and extinguished the rest of the fire there."[3] Thereafter, they "opened up the back, just to open it up [and] [t]hat's where [they] found the deceased individual," later identified as Leon.

Leon was observed "laying on his stomach sprawled out" and "did not have a shirt on." There was blood along the back of his head and chest, and "there was also blood on the floorboard of the vehicle in the rear." Leon "had significant burning trauma to the front of his body and to his face," and "[h]e had several injuries on his back that were

---

[3]A fire investigation discovered "torn up pages of a phonebook and some other debris that appeared to be from the glove box of the vehicle that had burned and that had also burned the carpet below those items." Arson investigator Victor Mabry testified there "were indeed two separate and independent areas of fire, [and] [t]hey were both intentionally set on fire with an open flame device, such as a cigarette lighter or a match, and the ordinary combustible items of paper, like a telephone book and items in the glove box that [he] found inside."

readily apparent from the exterior of the vehicle." He also "had pretty significant swelling between his eye and nose," and "his left shoulder was deformed, dislocated."

Further, Leon had a bullet wound in his left shoulder, a bullet graze wound on his chest and right shoulder, and a bullet graze wound on his left ear near where a bullet entered through the base of the skull. A bullet was located inside Leon's skull, and it was determined it was shot into his head behind his left ear and it was "traveling upward forward and to the right." There was "no soot, stippling, nor [was] there any gunpowder residue deep within the wound tissue," which meant the firearm must have been at least two to four feet away when fired. It was determined Leon's body was burned after death. Further, it was determined Leon had "been deceased for 2 to 12 hours" before being discovered by fire personnel. Pathologist Eugene Carpenter testified the cause of death was "[m]ultiple gunshot wounds."

### *Physical Evidence Found at the Crime Scene*

Law enforcement also investigated the surrounding crime scene. Officers searched the Silverado and located "blood on the floorboard of the vehicle in the rear" and a "transfer of smeared blood on the headrest of the front driver's and passenger seat." Further, there were "blood transfer patterns on the door handle as well as the door latch," and blood staining on the front driver's seat and gray center console. In the Silverado's rear bed area "[t]here was a dent with a—what appeared to be the impression of [something] being pressed up against it," and there was a "transfer of blood on the bed." Thomason's left palm print was located on the driver's side of the truck.

Officers also located "a bullet projectile … underneath the headliner or inside the headliner." It was determined "the bullet was traveling from a direction just, in general, from the driver's side toward the passenger side of the vehicle." However, it was unclear whether the bullet was shot from the driver's seat or the rear driver's side.

7.

It was stipulated "[t]he spent bullet recovered during the autopsy of … Leon and the two spent bullets located in the red [Silverado] where Mr. Leon's body was found were fired by the same gun; however, none of these three spent bullets were fired by the Jimenez Arms .380 gun, which was located on August 1, 2018 in a bag carried by [defendant]."

**Reed's Interview with Law Enforcement**

Sergeant Robert Pair interviewed Reed for over an hour on July 30, 2018. Sergeant Pair received information Reed knew "more than what she was providing during the initial interview and wanted the opportunity to speak to her again to see if she would be truthful." Therefore, on July 31, 2018, he interviewed Reed a second time. She provided officers with defendant's telephone number and told officers she observed both defendant and Thomason leave in the Silverado. During a photo lineup, Reed identified defendant as "Bless-Bless," one of the individuals involved in the offenses. (Defendant went by the nicknames of "Mac," "For-eva," and "Bless-Bless.")

**Alyssa G.'s Interview with Law Enforcement**

Alyssa G. testified that when she spoke with officers she was using methamphetamine and her "state of mind was really messed up." During the interview, Alyssa G. stated she had observed Thomason with a firearm on the night of the murder. Initially, Alyssa G. did not believe defendant was involved, however, she changed her story and said, "I didn't know that [defendant] was involved at all. No, I take it back—not until I heard his voice yelling at him then I knew he was involved." Reed also told Alyssa G. defendant shot Leon and "threw him in the car in the passenger's seat and set the car on fire."

**Defendant's Arrest and Interview**

On August 1, 2018, law enforcement located defendant at a motel on Easton Drive after his cell phone was "pinged." ("An exigent ping is where you can acquire GPS data

8.

location for the device where it's being located off the closest tower hit [and] [¶] … [¶] [i]t will give you like a pin of where they believe it's at.") Officers arrested defendant and he "advised he had a firearm in a bag he was carrying." Officers seized a "black trash bag" and inside were "miscellaneous clothing, cosmetic items, and then later a firearm." Specifically, it was a .380 caliber Jimenez firearm – the firearm that was the subject of the stipulation. (It was further stipulated defendant had a felony conviction prior to July 2018.)

That same day, officers interviewed defendant. Defendant admitted he owned and possessed the Jimenez firearm, but denied being inside the Silverado the night of the murder.

### Subsequent Law Enforcement Investigation

#### *Cell Phone Data*

Law enforcement also seized defendant's cell phone. Kern County District Attorney Investigator Brian Canaday testified as an expert in analyzing cell phone data. Investigator Canaday analyzed defendant's cell phone usage and concluded both his cell phone and Leon's cell phone "used the Verizon tower that provides coverage to the Q Street area" at 8:21 p.m. and 8:54 p.m. Further, defendant's cell phone was in the area of Pacheco Road in the time frame between 9:50 p.m. and 11:00 p.m. Subsequently, at 12:54 a.m. and 12:55 a.m., defendant's cell phone was still in the same area of Pacheco Road. Finally, on July 27, 2018, at 1:21 a.m. and 1:34 a.m., defendant's cell phone received a call from Sutton.

#### *Forensic Evidence*

Criminalist Garett Sugimoto was assigned to the Kern Regional Crime Laboratory and worked as a DNA analyst. Sugimoto analyzed DNA from swabs taken at the crime scene. Although defendant was excluded from the DNA profile found at the interior rear driver-side door and the interior rear passenger-side door, he could not be excluded from

9.

DNA profiles found on the interior and exterior front passenger-side door handles on the Silverado. Specifically, as to the front passenger-side door handle, "for the African-American population …, it would be 31 sextillion times more likely that it's [defendant] than a coincidental match to an unrelated person."

**Thomason's Trial Testimony**

Thomason and defendant were tried together; however, each had a separate jury. (Thomason filed a separate notice of appeal, which we address in case No. F084809.)

Thomason testified he was working on his car when he "heard a bunch of commotion over by … Reed's house, and then they were over there fighting and stuff." He observed defendant, "[defendant's] supposed[] street dad[,]" Sutton, and Leon fighting. Defendant then forced Leon into the Silverado. Subsequently, defendant got in the driver's seat, defendant's "street dad" in the front passenger seat, and Leon into the rear passenger seat of the Silverado. Thomason acknowledged previously telling officers Sutton was the front passenger, but testified he was mistaken.

After observing Leon being forced into the Silverado, Thomason entered the rear driver's seat of the Silverado next to Leon "[t]o defuse the situation, to try to defuse the situation." Leon had blood coming "[f]rom his head" and "[h]e was swollen in the face at the time." Defendant and Leon started arguing about money and "[t]hat's when [Leon] took out his wallet, and [Thomason] showed [defendant]. Look, [defendant] there's no money in here." Defendant and Leon started "grabbing hands" and fighting on the center console area. At this point, Thomason observed defendant shoot Leon three times from the driver's seat. Subsequently, Thomason told defendant, "[D]rop me off. I don't want to be in this vehicle, you know. I don't know what the heck is going on, and that's when [Thomason] had got dropped off" at Panama Lane where his wife eventually picked him up. Thomason then got rid of his clothes because they were covered in blood. Thomason further testified he never owned nor possessed any firearms.

10.

Defendant did not testify in his defense. However, in support of his defense argument he lacked the motive to steal Leon's money, the parties stipulated, "[Defendant] received a tax refund in the amount of $7,500 in May of 2018 and disability backpay in the amount of $2,700 on June 30, 2018, and an additional amount of disability backpay in the amount of $700 on July 3, 2018."

**DISCUSSION**

## I. The Trial Court Properly Denied Defendant's Severance Motion as to the Felon in Possession of a Firearm Charge (Count 6)

Defendant contends the trial court prejudicially erred when it denied his severance motion and allowed introduction of evidence that he "was in possession of another firearm, not the murder weapon, four days after the homicide." (Capitalization omitted.)

### A. Additional Factual Background

The information charged defendant with being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 6) on July 27, 2018. Trial counsel filed a "Motion to Sever Count Six from Counts One Through Five" pursuant to section 954. Specifically, trial counsel argued "Count 6 is not connected together in its commission with Counts 1–5," and "[e]vidence that [defendant] allegedly possessed a firearm on August 1, 2018, … will cause jurors to be more inclined to improperly infer criminality on the part of defendant, and convict on the other very serious and distinctly different life-exposure counts alleged in Counts 1–5."

At the motions in limine, the prosecutor argued that count 6 "should be allowed to remain within the charge [¶] … [¶] [because] it's extremely relevant as it relates specifically to the felony murder." After further argument, the trial court stated its ruling as follows:

> "Okay. First, under [section] 954, I think the elements can be met by the prosecution. [Evidence Code section] 352 always is the final analysis to do. It sounds like the firearm is relevant, not forensically, but based on the changes of the law in felony murder.

11.

"In regard to the concern of felon in possession, I believe that can be sanitized. I just did it in a trial right before this so that he was not allowed to legally possess the firearm, something like that. If there's an agreement to that and a stipulation to that, which would then require [defendant] to make a determination whether he wanted to admit that prior for that purpose or not outside the presence of the jury. So that can be addressed.

"I believe that the prior conviction is—although it's always in dispute, is not really in dispute so that a sanitized version could be provided to the jury that would be less prejudicial and indicates simply that he was not allowed to possess the firearm, which would then not address a prior felony unless, of course, he testifies, then that might be relevant for impeachment purposes. [¶] … [¶]

"… Okay. I'm not going to sever Count 6. My tentative was to sever, but I've changed that thought for the reasons I stated. I am amendable [*sic*] and I think it would be helpful, if [defendant] is amendable [*sic*] to it, to address how to—I mean, not sanitize but make a little less prejudicial the fact that he was not to possess a firearm before. Of course, if [defendant] testifies, that's fair game to be used as a prior felony conviction because it would go to credibility."

Subsequently, the trial court instructed the jury that, even if another person committed the act resulting in death, defendant could still be found guilty of first degree of murder if:

"1. The defendant committed, or attempted to commit, or aided and abetted kidnapping, robbery, or attempted robbery;

"2. The defendant intended to commit, or intended to aid and abet the perpetrator in committing kidnapping, robbery, or attempted robbery;

"3. If the defendant did not personally commit kidnapping, robbery, or attempted robbery, then a perpetrator, whom the defendant was aiding and abetting committed or attempted to commit kidnapping, robbery, or attempted robbery;

"4. While committing kidnapping, robbery, or attempted robbery, the perpetrator caused the death of another person;

"5. The defendant was a major participant in the kidnapping, robbery, or attempted robbery; AND

"6. When the defendant participated in the kidnapping, robbery, or attempted robbery he acted with reckless indifference to human life. [¶] … [¶]

"A person *acts with reckless indifference to human life* when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death.

"When you decide whether the defendant acted with *reckless indifference to human life*, consider all the evidence. No one of the following factors is necessary, nor is any one of them necessarily enough, to determine whether the defendant acted with reckless indifference to human life. Among the factors you may consider are:

- "• Did the defendant know that a lethal weapon would be present during the kidnapping, robbery, or attempted robbery[?]

- "• Did the defendant know that a lethal weapon was likely to be used?

- "• Did the defendant know that a lethal weapon was used?

- "• Did the defendant know the number of weapons involved?

- "• Was the defendant near the person killed when the killing occurred?

- "• Did the defendant have an opportunity to stop the killing or to help the victim?

- "• How long did the crime last?

- "• Was the defendant aware of anything that would make a coparticipant likely to kill?

- "• Did the defendant try to minimize the possibility of violence?

"When you decide whether the defendant was a *major participant*, consider all the evidence. No one of the following factors is necessary, nor is any one of them necessarily enough, to determine whether the defendant was a major participant. Among the factors you may consider are:

- "• What was the defendant's role in planning the crime that led to the death?

- "• What was the defendant's role in supplying or using lethal weapons?

13.

"• What did the defendant know about dangers posed by the crime, any weapons used, or past experience or conduct of the other participants?

"• Was the defendant in a position to facilitate or to prevent the death?

"• Did the defendant's action or inaction play a role in the death?

"• What did the defendant do after lethal force was used?"  (Italics in original)

With regard to the firearm possession, the prosecutor argued the following:

"[Defendant] was found with a firearm.  Felon in possession.  He admitted to having it for over a month.  It's a .380.  Based on his testimony, he possessed that firearm the day of the incident.

"Is there any evidence that he had it on his person?  He said he had it for protection.  Why wouldn't he have it on his person?  Did he use it to shoot?  No, but he did possess a firearm that day, that being July 27, 2018.  This is the instruction again.  Possession for a prior conviction of a felony.  Know that you have a gun and possessed the gun."

The prosecutor continued:

"[Defendant] was involved in the beating outside of the truck, in the truck.  You see the blood smeared on the front console area.  The beating happened all over the place.  He's involved in it.  He has to change his clothes.  He has to cover up the scene and burn it.

"Intentional act, he was involved in the intentional act, intentional violence.  Ultimately, did he fire the fatal shot?  No, but what he did is dangerous to human life.  He's an aider and abett[o]r to second degree murder.  He's also guilty as it relates to felony murder.  I won't go through the other one.  I'll focus on felony murder.

"Major participant with a reckless indifference for human life.  What's the desire for everybody that day—Jamie Reed, Alyssa G[.], Derrick Sutton, [defendant], and Seantazz Thomason—was to rob Moises Leon.  That was the intent.  But all the evidence shows, back of the seat torn off, wallet thrown out, words of the witnesses, but that's what the intent was.

"That's why [defendant] was in the car.  Reckless indifference to human life, great risk of death.  Again the sheer magnitude of the violence

14.

that was inflicted on Mr. Leon.  Lethal weapons were present.  These weapons were out and about.  He possessed a firearm that day.  Opportunity to stop the killing, did nothing.

"Tried to cover up the crime, length of the crime.  Five minutes, ten minutes, it went on and on.  Anything that would make a coparticipant likely to kill?  Again, if someone is being pistol whipped, prodded with a gun, beaten, shoulder dislocated, your collarbone separated, any reasonable person would know.

"Tried to minimize the possibility of violence?  No.  [Defendant] acted with a reckless indifference for human life during the course of that incident.  Role in the planning of the crime, they're all involved.  Again, think about the people in the boat with the fishing poles.  What they do after can point back to what the agreement was.  Going through the wallet, tearing seats apart.  What does that point to the agreement being?

"The dangers posed by the crime.  These are all seen in the blood and injuries.  Position to facilitate or prevent death.  He was and he did nothing, did nothing.  Drove him around, drove the dead body all the way across town.  I mean, think about how many hospitals they passed going south.  Think about it.  Guy shot three times in the car and is bleeding everywhere.  How many hospitals did they go by?

"Action or inaction play a role in the death.  Absolutely, his action did.  What did the defendant do after lethal force was used?  Tried to cover up the crime.  He lied to police, went away from his residence where he was staying, started staying in a motel somewhere.  Major participant in this crime and he acted with reckless indifference."

## B.    Applicable Law

Section 954 provides in part, "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts."  The trial court "in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."  (*Ibid*.)

15.

We review the denial of a motion to sever for abuse of discretion. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.) "'The state's interest in joinder gives the court broader discretion in ruling on a motion for severance than it has in ruling on admissibility of evidence.'" (*Id*. at p. 1221.)

"Because it ordinarily promotes efficiency, joinder is the preferred course of action. When the statutory requirements are met, joinder is error only if prejudice is clearly shown." (*People v. Scott* (2011) 52 Cal.4th 452, 469.) "'"[I]f the evidence underlying the offenses in question would be 'cross-admissible' in separate trials of other charges, that circumstance normally is sufficient, standing alone, to dispel any prejudice and justify a trial court's refusal to sever the charged offenses."'" (*Id*. at p. 470.)

If the evidence is not cross-admissible, "we next inquire 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' [Citations.] We consider '[1] whether some of the charges are likely to unusually inflame the jury against the defendant; [2] whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and [3] whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case.' [Citation.] 'We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state.'" (*People v. Thomas* (2012) 53 Cal.4th 771, 798–799.)

### C.    Analysis

"'"'[T]he first step in assessing whether a combined trial [would have been] prejudicial is to determine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others.'"'" (*People v. Jenkins* (2000) 22 Cal.4th 900, 948, quoting *People v. Bradford* (1997) 15

Cal.4th 1229, 1315–1316.)  In other words, the cross-admissibility of the evidence is sufficient to negate prejudice without any further showing.  (*People v. Jenkins*, at p. 948.) However, the absence of cross-admissibility, by itself, is insufficient to demonstrate prejudice.  (*People v. Memro* (1995) 11 Cal.4th 786, 850.)

Here, the People argue "the evidence at issue would have been cross-admissible in separate trials because [¶] … [¶] [defendant's] possession of a firearm four days after the murder was relevant to demonstrate his knowledge and use of weapons."  We disagree. Although a "'defendant's awareness that a gun … will be used,' whether the defendant personally used a lethal weapon, and the number of lethal weapons used" is relevant to proving an individual acted with reckless indifference to human life (*In re Harper* (2022) 76 Cal.App.5th 450, 460, quoting *People v. Clark* (2016) 63 Cal.4th 522, 618–622), the mere possession of a firearm, not used by the defendant during the target offenses and possessed several days after the offenses had already concluded, is hardly relevant to prove reckless indifference to human life as to the felony murder.  (See *People v. Osuna* (2014) 225 Cal.App.4th 1020, 1038 [holding that being a felon in possession of a firearm is considered a nonviolent and nonserious offense], disapproved of on other grounds in *People v. Frierson* (2017) 4 Cal.5th 225, 240, fn. 8; see *People v. White* (2014) 223 Cal.App.4th 512, 524 ["Thus, while the act of being armed with a firearm—that is, having ready access to a firearm [citation] —necessarily requires possession of the firearm, *possession of a firearm* does not necessarily require that the possessor be armed with it" (italics added)].)  Accordingly, the evidence surrounding defendant's possession of a firearm (count 6) was not cross-admissible.

However, the absence of the cross-admissibility factor is not dispositive.  (*People v. Memro*, *supra*, 11 Cal.4th at p. 850.)  "In the absence of cross-admissibility, we turn to the remaining factors to assess whether the trial court abused its discretion."  (*People v. Simon* (2016) 1 Cal.5th 98, 123–124.)  First, joinder of the felon in possession of a firearm charge (count 6) with the remaining charges was not "'likely to unusually inflame

17.

the jury against the defendant.'" (*People v. Thomas*, *supra*, 53 Cal.4th at pp. 798–799.) As noted above, the facts surrounding the kidnapping, robbery, torture, and murder were heinous. Defendant aided and abetted Thomason in robbing and torturing Leon, and ended up burning the Silverado and Leon's body after Thomason shot and killed him in cold blood. As it relates to the firearm charge, the People introduced evidence that: (1) defendant was found with a .380-caliber Jimenez firearm located in a trash bag he was carrying several days after the offenses concluded; (2) none of the bullets found at the crime scene "were fired by the Jimenez Arms .380 gun"; and (3) defendant had a felony conviction prior to 2018. Based on the severity of the kidnapping, robbery, torture, and murder offenses, the gun possession evidence was not likely to inflame the jury. Indeed, during his argument to the jury, the prosecutor never once mentioned the gun possession evidence in support of finding defendant guilty of first degree murder.

Second, although unclear, it appears defendant contends the possession charge was used to buttress a weak felony-murder case. To demonstrate the potential for a prejudicial spill-over effect, a defendant must show an "extreme disparity" in the strength or inflammatory character of the evidence. (*Belton v. Superior Court* (1993) 19 Cal.App.4th 1279, 1284.) "The core prejudice concern arising in connection with this [factor] is that jurors may aggregate evidence and convict on weak charges that might not merit conviction in separate trials." (*People v. Simon*, *supra*, 1 Cal.5th at p. 127.) However, the concerns outlined in *Simon* are not present in this case because the evidence against defendant demonstrating his guilt was overwhelming. Defendant was seen leaving with Thomason and Leon in the Silverado where Leon was then beaten, tortured, and murdered; there was evidence demonstrating defendant may have been both the shooter and the individual who burned the Silverado with Leon inside; defendant's cell phone was used in the area of Pacheco Road—the same area where the burned Silverado was located; and defendant's DNA was found inside the Silverado, demonstrating he was in the vehicle when Leon was tortured and murdered.

Finally, none of the counts alleged against defendant was a capital charge. Here, other than the lack of cross-admissibility, the other three factors to be considered do not weigh in favor of a prejudice finding. Therefore, it was reasonable for the trial court to conclude that trying both the July 27, 2018, charges *and* the August 1, 2018, firearm possession charge (count 6) together would not be unduly prejudicial to defendant when balanced against the benefits to the state of joinder.

## II. There Was Sufficient Evidence to Corroborate the Accomplices' Testimony

Defendant further contends that "[a]side from the accomplice statements and testimonies, there is a lack of evidence connecting [him] with the murder itself or with the predicate felonies of robbery, kidnapping, and torture."

### A. Applicable Law

Section 1111 states: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." This statute reflects the Legislature's determination that "'because of the reliability questions posed by'" accomplice testimony, such testimony "'by itself is insufficient as a matter of law to support a conviction.'" (*People v. Najera* (2008) 43 Cal.4th 1132, 1137, quoting *People v. Cuevas* (1995) 12 Cal.4th 252, 261.) "Thus, for the jury to rely on an accomplice's testimony about the circumstances of an offense, it must find evidence that, '"without aid from the accomplice's testimony, tend[s] to connect the defendant with the crime."'" (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32.)

We review de novo whether an accomplice's testimony was sufficiently corroborated. (*People v. Pedroza* (2014) 231 Cal.App.4th 635, 650.) Such evidence must tend to connect the defendant with the commission of the offense, but it does not need to corroborate every fact to which the accomplice testified. (§ 1111; *People v.*

*Perez* (2018) 4 Cal.5th 421, 452.) Corroborating evidence may be circumstantial or slight, and it is entitled to little consideration when standing alone. (*Id.* at p. 453.) "The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.'" (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) The evidence must be viewed in the light most favorable to the judgment, and witness credibility is not considered. (*People v. Pedroza*, at p. 650.)

### B.  Analysis

Here, defendant argues he "was convicted exclusively by means of accomplice testimony," specifically, testimony by Alyssa G., Reed, Thomason, and Sutton. Although the accomplice testimony provided substantial evidence of defendant's guilt, it was not the only evidence of guilt presented in this case. The prosecutor introduced evidence establishing that both defendant's and Leon's cell phones "used the Verizon tower that provides coverage to the Q Street area" at 8:21 p.m. and 8:54 p.m.—the area where Leon was first forced into the Silverado. Subsequently, between 9:50 and 11:00 p.m., defendant's cell phone utilized a tower that provided coverage to Pacheco Road—the area where the Silverado was later found burned with Leon's body inside. Defendant's phone was still utilizing this tower at 12:54 and 12:55 a.m., which corroborated Thomason's testimony he was involved throughout the entire series of events.

Additionally, the prosecutor introduced DNA evidence, which established that defendant's DNA could not be excluded from the profiles found on the interior and exterior front passenger-side door handles of the Silverado. This corroborated the accomplices' testimonies defendant was inside the Silverado at the time of the kidnapping, robbery, torture, and murder. Nonetheless, defendant argues that "[r]egardless of when the DNA was deposited, [his] DNA did not prove [he] ever touched the door handle [because] [t]he DNA was just as likely to have come from a skin-to-skin transfer with [Leon], such as by shaking hands." Although this may have

been a reasonable inference from the evidence, the jury could have also believed the presence of defendant's DNA inside the Silverado made it likely defendant was inside the vehicle and was a major participant of the robbery and torture. (*People v. Perez*, *supra*, 4 Cal.5th at p. 452 [holding that corroborating evidence may be circumstantial or slight].) Accordingly, both the cell phone and DNA evidence corroborated Thomason's, Reed's, Alyssa G.'s, and Sutton's testimonies as to defendant's involvement in the underlying offenses.

## III.     CALCRIM No. 334

Defendant further contends the trial court prejudicially erred when it: "improperly failed to instruct that the suspect witnesses were accomplices as a matter of law;" and (2) "improperly instructed that [he] had the burden of proof to show that the prosecution witnesses, prime suspects in the robbery murder, were accomplices."

### A.     Additional Factual Background

During the jury instruction conference, the trial court stated that in regards to Thomason, Sutton, Reed, and Alyssa G., it would instruct the jury on CALCRIM No. 334. There was no objection. Subsequently, the jury was instructed with CALCRIM No. 334 as follows:

> "Before you may consider the statement or testimony of Jamie Reed, Alyssa G[.], Dereck [*sic*] Sutton, and Seantazz Thomason as evidence against the defendant, you must decide whether Jamie Reed, Alyssa G[.], Dereck [*sic*] Sutton, and Seantazz Thomason were accomplices. A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant. Someone is subject to prosecution if:
>
> "1. He or she personally committed the crime;
>
> "OR
>
> "2. He or she knew of the criminal purpose of the person who committed the crime;
>
> "AND

"3.  He or she intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime or participate in a criminal conspiracy to commit the crime.

"The burden is on the defendant to prove that it is more likely than not that Jamie Reed, Alyssa G[.], Derek [*sic*] Sutton, and Seantazz Thomason were accomplices.

"An accomplice does not need to be present when the crime is committed.  On the other hand, a person is not an accomplice just because he or she is present at the scene of a crime, even if he or she knows that a crime will be committed or is being committed and does nothing to stop it.

"A person may be an accomplice even if he or she is not actually prosecuted for the crime.

"If you decide that a declarant or witness was not an accomplice, then supporting evidence is not required and you should evaluate his or her statement or testimony as you would that of any other witness.

"If you decide that a declarant or witness was an accomplice, then you may not convict a defendant of All Crimes Except Count 6 alleged ONLY against [defendant], based on his or her statement or testimony alone.  You may use a statement or testimony of an accomplice that tends to incriminate the defendant to convict the defendant only if:

"1.  The accomplice's statement or testimony is supported by other evidence that you believe;

"2.  That supporting evidence is independent of the accomplice's statement or testimony;

"AND

"3.  That supporting evidence tends to connect the defendant to the commission of the crime.

"Supporting evidence, however, may be slight.  It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact mentioned by the accomplice in the statement or about which the accomplice testified.  On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission.  The supporting evidence must tend to connect the defendant to the commission of the crime.

22.

"The evidence needed to support the statement or testimony of one accomplice cannot be provided by the statement or testimony of another accomplice.

"Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

Subsequently, after the trial court instructed the jury, the following exchange occurred between the trial court and the prosecutor:

"[PROSECUTOR]: Your Honor, just a brief issue if I could raise it. I don't know if the Court wants me to do it off the record.

"THE COURT: No. Let's do it on the record.

"[PROSECUTOR]: My only concern is [CALCRIM No.] 334, the accomplice instruction. I believe that there's no dispute but the Court gave [CALCRIM No.] 334. The portion where it said the burden is on the defendant to prove it is more likely than not that Jamie Reed, Alyssa G[.], Derrick Sutton, and Seantazz Thomason were accomplices.

"I'm just concerned with the verbiage of that places a burden on the defendants. So when it was read, it kind of piqued my interest. They don't have the burden in this case, but that sentence places an element of a burden, especially when it's bringing up Mr. Thomason, who is a defendant in this case. I just had a concern about that particular line.

"THE COURT: It's true. It's the law.

"[PROSECUTOR]: I understand. I just have concerns with that. I wanted to raise that concern that may be something we can address tomorrow or I'll research tonight to see. Like I said, I had requested the other instruction.

"THE COURT: Well, I know you did, but there wasn't an agreement that Mr. Thomason was an accomplice, hence [CALCRIM No.] 334. So I can just reiterate to both juries that there's no burden upon either defendant to prove they're not guilty.

"[PROSECUTOR]: Okay.

"THE COURT: Does that address it?

23.

"[PROSECUTOR]: Yes.

"THE COURT: Okay."

The following day and immediately before closing arguments, the trial court reminded the jury as follows:

> "Just to remind you, [defendant] and [trial counsel] on his behalf, they don't have to prove that [defendant] is not guilty. The burden, and the sole burden, rests with the prosecutor …. I think you know that, but just to remind you of that, and the burden is beyond a reasonable doubt."

**B.    The Trial Court Properly Instructed the Jury with CALCRIM No. 334**

First, defendant argues "it was error [by the trial court] to fail to read CALCRIM No. 335 on accomplices as a matter of law" because "[w]ithout CALCRIM No. 335 there can be no assurance that [he] was not convicted on the uncorroborated testimony of one or more accomplices."

### 1.    *Forfeiture*

Generally, a "[f]ailure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights" (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927), or "if the instruction was an incorrect statement of the law" (*People v. Campbell* (2020) 51 Cal.App.5th 463, 495). Although both parties concede trial counsel made no objection to CALCRIM No. 334, defendant argues no objection was required because his "substantial rights" were affected. As we discuss in detail below, CALCRIM No. 334 did not affect defendant's substantial rights, nor was it an incorrect statement of the law. Therefore, defendant forfeited this instructional error claim on appeal. However, even if we assume the claim was properly preserved on appeal, the claim still fails on its merits.

### 2.    *Applicable Law*

"Whether someone is an accomplice is ordinarily a question of fact for the jury; only if there is no reasonable dispute as to the facts or the inferences to be drawn from the facts may a trial court instruct a jury that a witness is an accomplice as a matter of law."

24.

(*People v. Valdez* (2012) 55 Cal.4th 82, 145–146; see *People v. Fauber* (1992) 2 Cal.4th 792, 833–834; *People v. Tewksbury* (1976) 15 Cal.3d 953, 960.)  "The Bench Notes to CALCRIM No. 335 are in accordance with this statement of the law and, in no uncertain terms, advise that a trial court should:  'Give this instruction only if the court concludes that the witness is an accomplice as a matter of law or the parties agree about the witness's status as an accomplice.  [Citations.]  If there is a dispute about whether the witness is an accomplice, give CALCRIM No. 334.'"  (*People v. Johnson* (2016) 243 Cal.App.4th 1247, 1269.)

We review a claim for instructional error de novo.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)  "In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution."  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)  We consider the challenged instruction "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner."  (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)

### 3. Analysis

Here, the trial court correctly instructed the jury it had to determine whether Thomason, Reed, Alyssa G., and Sutton were accomplices pursuant to CALCRIM No. 334, rather than instructing they were accomplices as a matter of law pursuant to CALCRIM No. 335.  "'[P]roof of [direct] aider and abettor liability requires proof in three distinct areas:  (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.'"  (*People v. Pacheco* (2022) 76 Cal.App.5th 118, 127,

quoting *People v. Perez* (2005) 35 Cal.4th 1219, 1225.) "[W]here there is no direct evidence that a witness acted with the requisite knowledge and intent, the witness is not an accomplice as a matter of law." (*People v. Gonzalez* (2016) 246 Cal.App.4th 1358, 1375; see, e.g., *People v. Carrasco* (2014) 59 Cal.4th 924, 969 [witness not an accomplice as matter of law although he accompanied the defendant to the crime scene and helped the defendant escape after the murder, where the witness denied knowledge of and intent to assist the defendant in committing the robbery and claimed the defendant forced him to assist in the escape]; *People v. Valdez, supra*, 55 Cal.4th 82, 146–147 [witness was not an accomplice as a matter of law despite evidence he drove the perpetrators to the crime location after being told by the perpetrators that they had to go there "'to take care of something,'" which the witness understood to mean assault or kill someone]; *People v. Williams* (2008) 43 Cal.4th 584, 637 [witness was not an accomplice as a matter of law where he denied having the intent to further the defendant's criminal purpose and claimed to be present with the defendant for another reason]; *People v. Stankewitz* (1990) 51 Cal.3d 72, 90 [presence at the scene of a crime or failure to prevent its commission insufficient to establishing aiding and abetting].)

First, as to Thomason, in the typical situation, it would have been reversible error for the trial court to instruct the jury he was an accomplice as a matter of law because the court "would, in effect, be instructing the jury that the codefendant was guilty of the offenses charged, thereby invading the province of the jury with respect to the determination of [his or] her guilt or innocence." (*People v. Valerio* (1970) 13 Cal.App.3d 912, 924.) Thus, it was incumbent on defendant's counsel to argue why such an instruction would not constitute error in his case.

Second, as to Alyssa G. and Reed, there is no evidence they possessed any knowledge of Thomason's and defendant's unlawful purposes. Although the record shows Reed concocted the plan to rob Leon, and Alyssa G. aided Reed in this plan, there is no evidence they were aware of Thomason's and defendant's involvement in the

26.

robbery until after the offenses were already in motion. Further, there is no evidence they were aware of the kidnapping, torture, or murder.

Finally, although Thomason approached Sutton to involve himself in the robbery and told Sutton he wanted to use real firearms, Thomason testified he was unaware of the plans to rob Leon, never spoke with Sutton, and instead involved himself in the altercation to try and "defuse" the situation. Because of this conflicting evidence, Sutton's status as an accomplice was disputed. Accordingly, the trial court properly instructed the jury with CALCRIM No. 334 as to Thomason, Reed, Alyssa G., and Sutton.

## C. No Prejudice

However, even if we assume the trial court erred by not instructing the jury with CALCRIM No. 335, any error was harmless. Our Supreme Court has held it is state-law error when a trial court fails to instruct a jury regarding consideration of accomplice testimony and, as a result, a reviewing court must evaluate whether it is reasonably probable that such error affected the verdict. (*People v. Williams* (2010) 49 Cal.4th 405, 456; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 214.) First, the full context of the jury instructions minimized any potential prejudice from CALCRIM No. 334. (*People v. Houston*, *supra*, 54 Cal.4th at p. 1229.) At the outset, CALCRIM No. 334 instructed the jury that "[i]f you decide that a declarant or witness was an accomplice, then you may not convict a defendant … based on his or her statement or testimony alone," and that "[a]ny statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution … [and] [y]ou should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence" (CALCRIM No. 334). Further, the jury was properly instructed on how to evaluate Thomason's, Reed's, Alyssa G.'s, and Sutton's testimony (CALCRIM

27.

No. 226 [Witnesses]; CALCRIM No. 302 [Evaluating Conflicting Evidence]; CALCRIM No. 318 [Prior Statements as Evidence]).

Second, as we discussed in detail *ante*, the evidence sufficiently corroborated Thomason's, Reed's, Alyssa G.'s, and Sutton's testimony. Lastly, any presumed error in providing the jury with CALCRIM No. 334 was further mitigated by the prosecutor when he consistently referred to the other participants to the robbery as accomplices throughout his closing arguments. The record discloses there was no real dispute between defendant and the prosecution regarding the status of the participants as accomplices. Consequently, assuming it was error to instruct the jury pursuant to CALCRIM No. 334 instead of with CALCRIM No. 335, it was harmless because it is not reasonably probable defendant would have received a more favorable result absent the assumed error.

**D.**      **CALCRIM No. 334 Did Not Improperly Shift the Burden of Proof to Defendant**

Finally, defendant argues "it was error to instruct that [he] had the burden of proof to show accomplice status [because] [¶] … [¶] [s]hifting the burden to [him] in these circumstances was a violation of Due Process."

"California law permits placing the burden to prove the accomplice status of a witness on a defendant. ([*People v. ]Tewksbury*, *supra*, 15 Cal.3d at pp. 963–968.) This is because whether a witness is an accomplice is collateral to the defendant's guilt or innocence. (*Id*. at pp. 964–968.) It is an issue that need not be established to prove an element of the defendant's crime. (*Id*. at p. 965.) CALCRIM No. 334's instruction that a defendant must prove, by a preponderance of the evidence, a witness's status as an accomplice thus, in general, correctly states the law. (*People v. Frye* (1998) 18 Cal.4th 894, 967–969 … [upholding predecessor to CALCRIM No. 334], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)" (*People v. Martinez* (2019) 34 Cal.App.5th 721, 729.) Because the issue of "whether a witness is an accomplice is collateral to the defendant's guilt or innocence" (*ibid.*), it was not error for

the trial court to instruct the jury with CALCRIM No. 334, nor did it deprive defendant of due process.

We also reject defendant's alternative contention his trial counsel was ineffective for failing to object to CALCRIM No. 334. "Because we have addressed the merits of the underlying contentions and have concluded, above, that the actions at issue were not erroneous or improper, that the instruction[] [was] not warranted, or that any alleged error was not prejudicial, defendant's related claim[] of ineffective assistance of counsel fail[s] and do[es] not require further discussion." (*People v. Ledesma* (2006) 39 Cal.4th 641, 748.)

## IV. The Trial Court Properly Sentenced Defendant to a Consecutive Life Term for Kidnapping for Robbery.

Lastly, defendant contends "it was an abuse of discretion for the trial court to impose a consecutive term on Count Three" because "[t]here was a single intent and objective to the kidnapping for robbery and the murder."

### A. Additional Factual Background

At the sentencing hearing, the following brief exchange occurred between trial counsel and the trial court:

"[DEFENSE COUNSEL:] Also, as far as Count 3, the kidnap to commit robbery, I would ask for the Court to consider running that concurrent to Count 1 rather than consecutive. It was during the course of the kidnapping to commit robbery that Count 1 occurred. So the acts were not independent of each other. It's the same time, same place, and I would submit with that.

"THE COURT: Okay. Thank you. [¶] I suppose none of us really know, maybe [defendant] knows. None of us know the exact sequence of events as far as kidnapping to commit robbery then the killing of the victim. The kidnapping to commit robbery obviously started first; otherwise, there would not have been a victim alive in the car, and we had testimony that he was.

"So I think it is okay and proper to run that kidnapping, Count 3, consecutive."

Thereafter, as to count 3, the trial court sentenced defendant to a term of seven years to life to run consecutive to count 1.

## B. Applicable Law

Section 654 precludes punishing a defendant twice for "[a]n act or omission that is punishable in different ways by different provisions of law." (§ 654, subd. (a).) "The purpose of section 654 is to prevent multiple punishments for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime. Although the distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one offense." (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135.)

Section 654 also precludes multiple punishments for two offenses that arise from an indivisible course of conduct; if two crimes arose from the same act or series of acts constituting an indivisible course of conduct, multiple punishment is prohibited. (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1214–1215.) "The divisibility of a course of conduct depends upon the intent and objective of the defendant." (*People v. Liu*, *supra*, 46 Cal.App.4th at p. 1135.) If two offenses are incidental to one objective, the defendant may be punished for just one. But, if the "defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*Ibid.*) A ruling under section 654 is reviewed for substantial evidence. (*Liu*, at pp. 1135–1135.) "'To satisfy the substantial evidence standard, the evidence supporting the trial court's findings must be "'reasonable, credible, and of solid value.'" [Citation.]'" (*People v. Gyorgy* (2023) 93 Cal.App.5th 659, 669.)

## C. Analysis

"Where a defendant is prosecuted *solely* on a theory of first degree felony murder, section 654 precludes punishment for both murder and the underlying felony. (See, e.g., *People v. Hensley* (2014) 59 Cal.4th 788, 828 [sentence for felony underlying first degree felony-murder conviction must be stayed under § 654].) However, if the prosecution presents alternative theories—such as premeditation and felony murder—and there is evidence supporting a finding that the murder was premeditated, then the trial court may properly impose a sentence for both the murder and the felony. (*People v. Osband* (1996) 13 Cal.4th 622, 730–731 [affirming decision not to stay sentence for rape and robbery under § 654, where the trial court made implicit finding that crimes involved more than one objective, even though it was unclear whether murder conviction was based on felony-murder or premeditation theory].)" (*People v. Carter* (2019) 34 Cal.App.5th 831, 841.)

Here, defendant's conviction for first degree murder was not based solely on the theory of felony murder. The jury was instructed on multiple theories of first degree murder, including premeditated and deliberated murder, malice murder, and felony murder. Although the prosecutor's primary argument was defendant was guilty of felony murder as a major participant to kidnapping, robbery, or attempted robbery and who acted with reckless indifference to human life, he alternatively argued that either defendant or Thomason intentionally "pistol whipped" and "shot [Leon] multiple times," and that defendant is "an aider and abett[o]r to second degree murder." There was substantial evidence supporting the trial court's finding the kidnapping to commit robbery was independent from the murder because "otherwise, there would not have been a victim alive in the car." The trial court reasonably could have concluded defendant's objective in kidnapping Leon was independent of his objective in aiding and abetting Thomason, thereby justifying multiple punishments under section 654.

31.

Further, the jury did not have to make an affirmative finding that defendant shot Leon or aided and abetted in Leon's murder before returning its guilty verdict on first degree murder, and the trial court did not need such an affirmative finding by the jury to exercise its sentencing discretion under section 654. Generally, "in the absence of some circumstance 'foreclosing' its sentencing discretion …, a trial court may base its decision under section 654 on *any* of the facts that are in evidence at trial, without regard to the verdicts." (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1340.) Therefore, the trial court could properly find defendant harbored multiple criminal intents and objectives in attempting to kidnap and the murder of Leon. Accordingly, the trial court did not err when it imposed a consecutive term of seven years to life for defendant's kidnapping to commit robbery conviction (count 3).

## DISPOSITION

The judgment is affirmed.

PEÑA, J.

WE CONCUR:

DETJEN, Acting P. J.

SMITH, J.